## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ELLEN J. MENDELSOHN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION** |
| **v.** ) | **No. 03-2429-KHV** |
| ) | |
| **SPRINT/UNITED MANAGEMENT** ) | |
| **COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| _____) | |

## <u>MEMORANDUM AND ORDER</u>

Ellen J. Mendelsohn brings suit against Sprint/United Management Company ("Sprint") under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 <u>et seq</u>. This case is before the Court on remand from the Tenth Circuit, and on <u>Plaintiff's Combined (1) Motion To Hold Pretrial Evidentiary Hearing; And (2) Motion To Enforce Conditional Settlement Agreement</u> (Doc. #174) filed May 28, 2008. For reasons set forth below, the Court finds that plaintiff's motion should be overruled, clarifies the basis for prior evidentiary rulings and reiterates its view that consistent with the jury verdict in this case, Sprint is entitled to judgment.

Plaintiff's arguments in support of her motion for a pretrial evidentiary hearing and to enforce settlement bear scant relation to the Court's recollection and the official record of the relevant events. <u>See</u> <u>Memorandum In Support Of Plaintiff's Motion For Pretrial Evidentiary Hearing; And To Enforce Settlement</u> (Doc. #171) filed May 7, 2008 ("<u>Plaintiff's Hearing Memorandum</u>"). Indeed, as the case has progressed from this Court to the Tenth Circuit Court of Appeals to the Supreme Court, then back, each step appears to have put plaintiff's rhetoric at further remove from what actually occurred in this proceeding. Accordingly, the Court must digress to

recite in some detail the procedural and factual history of the proceedings in this Court.

## Factual And Procedural Background

Plaintiff was born August 8, 1951.  She began working for Sprint in September of 1983, at age 32.  In September of 1986, at age 35, she accepted a voluntary severance package.  In 1989, Sprint re-hired plaintiff at age 38, as a senior manager in its intermediaries marketing group.  Over the next 13 years plaintiff moved to several different positions due to reorganizations at Sprint.

Beginning April 30, 2001, plaintiff was a manager in Mobile Financial Services ("MFS"), an incubator group in the Business Development group in the Business Development and Strategy organization ("BDS") in the PCS (wireless) division.  In October of 2001, Jim Fee became Director of MFS.  Fee reported to Paul Reddick, Vice President of BDS.  Reddick reported to Bill Blessing, Senior Vice President of BDS.  From June to December of 2002, Sprint assigned Reddick to oversee a special project.  During that time, Fee reported directly to Blessing but Reddick continued to exercise certain authority over BDS.

In October of 2002, Sprint employed 65,000 to 70,000 individuals in four major divisions: PCS (wireless), long distance, local telephone and corporate.  See Trial Transcript Vol. 1 (Doc. #144) at 207-09, 229.  In late October of 2002, Sprint decided to reduce costs by approximately 25 per cent.  Accordingly, it implemented a reduction in force ("RIF") to eliminate 1,600 positions, including nearly 500 in PCS where plaintiff worked.  See id. at 224; Trial Transcript Vol. 3 (Doc. #146) at 42.  BDS had about 80 employees and Blessing decided to reduce that number by 25 to 30 per cent, i.e. by 20 to 24 employees.[1]  Blessing personally decided to eliminate two vice president

---

[1]      In deciding how to reorganize BDS, Blessing and Reddick solicited Fee's input on the performance of individual employees in the department, but Fee did not participate in deciding whose positions would be eliminated.

positions in BDS, and he terminated the employment of vice presidents Marc Elster (vice president of the BDS New Business Development group) and Doug Reinhardt (vice president of the BDS Strategic Alliances group).  See Trial Transcript Vol. 4 (Doc. #148) at 45-46.  Although Reddick was still on special assignment, Blessing asked him to oversee the RIF for the Business Development group within BDS.[2]  Within the reorganized Business Development group, Reddick decided which positions to eliminate and which employees to RIF, and he decided to terminate the employment of seven individuals: plaintiff and six others.[3]  Plaintiff was unsuccessful in seeking positions in other Sprint departments, and Sprint therefore terminated her employment.  While BDS eliminated approximately 25 positions overall, Sprint reallocated projects and responsibilities among different units.  As a result, MFS (where plaintiff had worked) actually added one position.

Plaintiff brought suit, asserting that in terminating her employment because of a RIF "precipitated by cost-cutting" in PCS, Sprint had discriminated on the basis of age.  The pretrial order did not suggest that the RIF embodied a company-wide pattern or practice of age discrimination, or complain that the RIF itself was anything but a legitimate cost-cutting measure.  Plaintiff's theory was that her termination was inconsistent with RIF criteria and/or that Sprint had

---

[2]  The organizational nomenclature in this case was confusing, to say the least.  Before the RIF in November of 2002, Reddick headed the BDS Business Development group, while Elster headed the BDS *New* Business Development group.   After the RIF, Reddick's Business Development group absorbed the *New* Business Development group which Elster had headed.
While on special assignment, Reddick retained the position of vice president of Business Development, and he helped Blessing decide how to deal with employees who had been in the BDS New Business Development group (which Elster had headed) and the BDS Strategic Alliances group (which Reinhardt had headed).

[3]  Four of the seven employees found jobs in other Sprint departments.  Furthermore, one employee had already decided to resign from Sprint because she was relocating.  Thus, only two employees were out of jobs because of Reddick's decisions: plaintiff and Natalie O'Bannon.  See Trial Transcript Vol. 1 (Doc. #144) at 259-60; Trial Transcript Vol. 5 (Doc. #149) at 61-68.

falsified or manipulated her evaluations under the RIF criteria.[4]  See Beaird v. Seagate Tech., Inc.,

145 F.3d 1159, 1168 (10th Cir. 1998); see also  Pretrial Order (Doc. #64) filed July 29, 2004 at 4-5.

The pretrial order focused exclusively on the RIF in MFS and BDS.[5]

_____

[4]       While the RIF was company-wide, the undisputed evidence on summary judgment was that decisions about which employees would be terminated to implement the RIF were made on a departmental level.  As noted, the pretrial order never claimed that the company-wide RIF was inherently discriminatory or that  Sprint had a company-wide policy or practice of discrimination on the basis of age.  Accordingly, this case focused on the individual conduct of plaintiff's supervisors (Blessing and Reddick), not on a company-wide policy of discrimination:  plaintiff claimed to be the victim of discriminatory decisions by Blessing and Reddick on how to implement a legitimate cost-cutting RIF, and not the victim of a RIF which was itself discriminatory.

[5]       The pretrial order specifically stated as follows:

[B]efore plaintiff's termination in November, 2002, there were four (4) groups within Sprint's Business Development & Strategy department called Incubator Groups [including plaintiff's MFS group].  There were three (3) other managers working under James Fee within plaintiff's group.  All three (3) of the other managers were under the age of 40.  Plaintiff was the oldest manager in her BDS group.

Immediately after plaintiff's termination on November 22, 2002, two younger individuals under the age of 40, Whitney Siavelis and Dan McCauley, were transferred into [the MFS group]. . . .

In the other three (3) incubator groups, there were twelve (12) managers, in jobs which plaintiff was qualified to perform.  All twelve managers were younger than plaintiff.  All kept jobs within Sprint after the RIF.

See Pretrial Order (Doc. #64) at 4-5.  The pretrial order complained almost interchangeably about plaintiff's termination, the reassignment of her work to younger employees and the fact that Sprint did not offer her other positions outside MFS or BDS.  As a practical matter, however, the gravamen of her complaint was wrongful termination.  In the summary judgment proceedings and at trial, plaintiff cited the reassignment of job duties as evidence of pretext and she did not make a point to identify any individuals who refused to employ her in other positions at Sprint or allege that Sprint denied her specific new positions on account of her age.  In other words, plaintiff focused upon the decision to terminate her employment.  Her response to defendant's motion for summary judgment identified Reddick as the decision-maker in that regard.  See Plaintiff's Response To Defendant's Motion For Summary Judgment (Doc. #70) at 87.
        At some point after the proceedings in this Court, plaintiff apparently reinvented the theory of the case.  She now claims that the overarching theory on which she went to trial, as reflected "in

(continued...)

-4-

A.   Defendant's Motion In Limine

Before trial, Sprint filed a motion in limine to exclude various categories of evidence, including testimony that Sprint had engaged in age discrimination against employees who were not similarly situated to plaintiff, and testimony concerning age-derogatory comments by Sprint employees.  See Defendant's Motion In Limine (Doc. #78) filed December 15, 2004 at 1-3.

1.   Evidence of Discrimination Against Other Employees By Other Supervisors

Paragraph 1 of Sprint's motion in limine specifically sought to exclude:

Any reference to: Sprint having a "pattern and practice" of age discrimination, a culture of age discrimination, a history of age discrimination, or any similar broad allegation of age discrimination, including through its Alpha rating or staff associate program; any reference to age discrimination litigation against Sprint; and/or any reference to specific allegations of discrimination against Sprint employees not similarly situated to Plaintiff.

Id. at 1.  Sprint noted that plaintiff had not alleged disparate impact or a pattern and practice of

---

⁵(...continued)
1200+ pages of transcript, and numerous documents" (but apparently not the pretrial order) was that Sprint *generally* used the RIF "as a mask to get rid of older workers, under the pretext of Sprint 'explaining' that they were merely keeping the stronger, while shedding the weaker employees." Plaintiff's Hearing Memorandum (Doc. #171) at 19.  As noted, prior proceedings, including the pretrial order, assumed that the RIF was a legitimate cost-cutting measure; the issue as to plaintiff was whether Sprint implemented it in a way which discriminated on account of her age.

The pretrial order controlled the course of the proceedings in this Court, and throughout all stages of the case the Court looked to it as an accurate statement of plaintiff's claims and legal theories.  See Wilson v. Muckala, 303 F.3d 1207, 1215-16 (10th Cir. 2002) (pretrial order supercedes pleadings and controls subsequent course of litigation); Jones v. Wichita State Univ. 528 F.Supp.2d 1182, 1194 (D. Kan. 2007) (rejecting claim raised in response to motion for summary judgment but which plaintiff did not assert in pretrial order).  The Court did not understand that at trial, plaintiff had changed her overarching theory of the case to be that the companywide RIF was inherently discriminatory.  In fact, at one point, the Court proposed dealing with an evidentiary issue by proposing to "take care of this by telling the jury that there's no claim in this case that the RIF itself was inherently discriminatory on the basis of age."  Supreme Court Joint Appendix And Petitioners' Appendix Page Cited In Supplemental Brief On Remand For The Supreme Court Of The United States (Doc. #167-2) at 22.  Plaintiff's counsel did not object to this characterization of the issues or inform the Court that plaintiff's theory of the case was different from the Court's understanding.

discrimination, and argued that claims of discrimination by employees who were not similarly situated to plaintiff were not relevant under Rule 401, Fed. R. Evid.[6]  See Memorandum In Support Of Defendant's Motion In Limine (Doc. #79) filed December 15, 2004 at 1-3.  Sprint also argued that the danger of unfair prejudice, confusion of the issues, misleading of the jury and undue delay substantially outweighed any probative value of such evidence.  Id. at 3; see Rule 403, Fed. Rule Evid.[7]  In the memorandum in support of its motion, Sprint specifically asked the Court to prevent plaintiff from presenting evidence concerning Sprint's treatment of 11 named individuals who were not similarly situated to plaintiff because they did not have the same decision-maker as she did.  Specifically, Sprint sought to exclude anecdotal testimony that Sprint discriminated on the basis of age against Elster, Reinhardt, Bonnie Hoopes, John Hoopes, Patty Porter, Yvonne Wood, Sharon Miller, John Borel, Carol Kippes, Shirley Williams and Dawne Adams.[8]  See Memorandum In Support Of Defendant's Motion In Limine (Doc. #79) filed December 15, 2004 at 2-3.

In response to Sprint's motion, plaintiff complained that it was "wrong" for defendant to raise "overly general, conclusory accusations about how defendant speculates age discrimination

---

[6]      Rule 401, Fed. R. Evid., provides as follows:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

[7]      Rule 403, Fed. R. Evid., provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[8]      At some point after the proceedings in this Court, the parties apparently began to refer to testimony about these individuals as "me too" evidence.

evidence might come in," but she did not give any reason why discrimination against the 11 individuals named in Sprint's motion would be relevant to her own theory of liability. <u>See</u> <u>Plaintiff's Memorandum In Opposition To Defendant's Motion In Limine</u> ("Plaintiff's Opposition") (Doc. #87) filed December 20, 2004, at 4. She did argue that she had admissible evidence of a culture or history of age discrimination at Sprint. Through purely boilerplate analysis, plaintiff argued that she was entitled to introduce evidence that Sprint terminated older, experienced employees from other departments.[9] She did not identify any employees or departments to which she was referring, however, or explain how evidence regarding those employees could be logically or reasonably tied to the decision to terminate plaintiff's employment. <u>See</u> <u>Plaintiff's Opposition</u> (Doc. #87) at 2-4. In other words, while plaintiff generally argued that her evidence would be admissible even if the other employees did not work in plaintiff's department or have the same supervisors as plaintiff, she did not explain how testimony by or about them would be relevant to her theory of the case, <u>i.e.</u> that Sprint discriminated by eliminating her position in MFS and BDS. Plaintiff had every opportunity to argue and proffer such evidence. Indeed, the entire point of Sprint's motion in limine was to address such evidence and determine its admissibility prior to trial.[10]

In a minute order dated January 3, 2005, the Court sustained Sprint's motion in limine in part. <u>See</u> Doc. #111 entered January 3, 2005. It determined that plaintiff could only offer evidence

---

[9]    Plaintiff's argument on this point was basically just a cut-and-paste from her brief in opposition to Sprint's motion for summary judgment. <u>See</u> <u>Plaintiff Ellen Mendelsohn's Response Opposing Defendant's Motion For Summary Judgment</u> (Doc. #70) filed August 24, 2004 at 97-100.

[10]    When it ruled on the motion in limine, the Court obviously did not have the benefit of the formal proffer which became the subject of plaintiff's appeal to the Tenth Circuit Court of Appeals and the proceedings in the United States Supreme Court – or, for that matter, any other proffer.

of discrimination against Sprint employees who were similarly situated to plaintiff and defined

"similarly situated employees" as ones (1) for which Reddick was the decision-maker in any adverse

employment action (not just plaintiff's RIF); and (2) whose employment was close in time to

plaintiff's.[11]   In doing so, it was not applying a per se rule that evidence from employees of other

supervisors is irrelevant in age discrimination cases.  Among other things, it was addressing the facts

that in opposing Sprint's motion in limine, plaintiff did not address any specific witnesses or case-

specific evidence which Sprint identified in its motion in limine; and that plaintiff did not pretend

to link any evidence from or about the 11 employees to any decision-maker in her case or to any

company-wide policy or practice of discrimination.  Also, the Court was giving due consideration

to both Rule 401 and Rule 403.  Thus, the Court did not adopt a categorical prohibition of what the

parties later came to call "me too" evidence; it held that "me too" evidence within plaintiff's

supervisory chain of command would be admissible, while "me too" evidence outside that chain of

command would be excluded.  Plaintiff's Memorandum In Opposition To Defendant's Motion In

Limine (Doc. #87) filed December 20, 2004, recognized that for evidence regarding other employees

to be admissible, it had to be within a relevant time frame and be "logically or reasonably" tied to

the adverse employment action against plaintiff.  Id. at 1, 3.  As the proponent of such evidence,

plaintiff had the burden of establishing the necessary nexus to her theory of the case.  See Fed. R.

---

[11]     Evidence how plaintiff's supervisors treated other employees was clearly relevant because it might yield an inference that the stated reason for plaintiff's termination was pretextual. Trial Transcript Vol. 5 (Doc. #149) at 94.  Based on the summary judgment record and the record on Sprint's motion in limine, Blessing told Reddick to reduce the BDS head count and Reddick decided which positions to eliminate.  Therefore, in retrospect, the Court should have included Blessing as a relevant decision-maker for purposes of its order on Sprint's motion in limine.  Any oversight in this regard was immaterial, however, because even though Blessing had terminated two vice presidents who were the subject of Sprint's motion in limine (Elster and Reinhardt), plaintiff's subsequent proffer did not suggest that Blessing had discriminated against them (or, indeed, anyone but plaintiff).

Evid. 104 (when relevancy of evidence depends on fulfillment of condition of fact, court must admit such evidence on, or subject to, introduction of evidence sufficient to support finding of fulfillment of the condition).  She made no effort to do so.  Furthermore, she did not ask the Court to defer ruling until the time of trial, and the Court never suggested to plaintiff that it intended to do so.

The purpose of a motion in limine is to aid the trial process by enabling the Court "to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  United States v. Cline, 188 F. Supp.2d 1287, 1291 (D. Kan. 2002) (quoting Palmieri v. Defaria, 88 F.3d 136, 141 (2nd Cir. 1996) (further citations omitted).  Pretrial rulings often may save time at trial, as well as save the parties time, effort and cost in preparing their cases.  See Cline, 188 F. Supp. at 1291.  The Court recognizes that in many cases, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in the proper context.  See Sperberg v. Goodyear Tire & Rubber Co., 519 F.2d 708, 712 (6th Cir. 1975) (though in limine rulings can save time, cost, effort and preparation, court is usually better situated during trial to assess evidence); Rettiger v. IBP, Inc., 1999 WL 318153, at *2 (D. Kan. 1999) (a court is almost always better situated during actual trial to assess value and utility of evidence).  In this case, largely because of plaintiff's failure to establish the necessary nexus between her case and testimony by or about the eleven employees in question, the issue appeared to be straight-forward – one which could easily be resolved in advance of trial without prejudice to the rights of any party and with substantial benefits from a trial management perspective.[12]

_____

[12]    Plaintiff apparently expected to make a live offer of proof from all 11 witnesses during the course of trial.  Such a procedure would have quite substantially interfered with the trial process, wasted the jury's time by delaying the trial and inconvenienced the witnesses themselves.
(continued...)

In summary, the Court did not exclude evidence regarding the 11 employees because such evidence was per se irrelevant under Rule 401.[13]  It excluded such evidence because plaintiff did not identify any "me too" evidence which was relevant to her theory of the case, as articulated in the pretrial order, or suggest that she could establish a basis for admission under Rules 401 or 403, or any other rule of evidence.[14]

   2.   Evidence Of Age-Derogatory Remarks

Paragraph 5 of Sprint's motion in limine sought to exclude "[a]ny reference to age-derogatory remarks by any Sprint employee."  See Defendant's Motion In Limine (Doc. #78) at 3.

---

[12](...continued)
Plaintiff had an opportunity to make a written proffer during the briefing on Sprint's motion in limine.  Also, plaintiff could have requested a preliminary hearing in advance of trial, to further address the issues.  Consequently, the Court was disinclined to grant plaintiff's spontaneous, mid-trial, eleventh hour request for an opportunity to present a live offer of proof.

[13]   This case does present a close question under Rule 401.  "Me too" evidence within plaintiff's chain of command was clearly relevant but, as noted, the issue in dispute involved "me too" evidence outside that chain of command.  At some point in the organizational hierarchy at Sprint – the CEO level if not sooner – the chains of command for the two groups of "me too" employees presumably converged.  Nothing in the record suggested what the point of convergence was, or whether the Sprint employee who occupied that position had anything to do with the decision to terminate plaintiff's employment.  Perhaps at some metaphysical level, everything which happens at Sprint is relevant to every other thing which happens at Sprint, and all events are relevant to every decision which Sprint makes, because decisions are not made in a vacuum but within the context of an organizational "culture."  The Court did not consider that issue in the context of the motion in limine because plaintiff did not raise it at the time.  Even so, the issue of relevancy is not dispositive.  Even if such evidence outside plaintiff's chain of command was relevant under Rule 401, the Court continues to believe that it was clearly inadmissible under Rule 403.

[14]   As noted, the pretrial order did not allege a pattern or practice of discrimination, and plaintiff did not offer the evidence of the 11 witnesses under Fed. R. Evid. 404(b), which provides in relevant part as follows:

   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .

-10-

As to such remarks, defendant argued that Reddick was the decision-maker and that evidence of age-derogatory remarks by any other Sprint employee was irrelevant under Rule 401 and inadmissible under Rule 403.  See Defendant's Memorandum In Support (Doc. #79) at 5-6.  In response, without citation to authority, plaintiff made the dismissive argument that evidence of any remarks "by upper-level management with decision making authority" was "of course" admissible and that defendant's argument to the contrary "deserve[d] little attention."  See Plaintiff's Opposition (Doc. #87) at 7-8.  Plaintiff did not identify a single age-derogatory remark which she wished to introduce into evidence.  In addressing the issue – again taking into account Rules 401 and 403 – the Court therefore ruled that age-derogatory remarks by Reddick, as decision-maker, would be admissible but others would not.  Id.[15]

B.   Rulings During Trial

       1.   Evidence of Discrimination Against Other Employees By Other Supervisors

              On many occasions over the course of the trial, the Court further addressed the admissibility of "me too" evidence inside and outside plaintiff's chain of command.  In retrospect, upon reading the transcript, it is clear that the Court did a poor job explaining its reasoning, which was specifically mindful of the fact that plaintiff was part of a huge RIF which terminated approximately 25 employees in BDS, 500 in PCS, and 1,600 company-wide.  Given (1) the size of the RIF, (2) the fact that plaintiff had never characterized the RIF as anything but a legitimate cost-cutting measure, and (3) the fact that prior to trial, plaintiff had not established a sufficient nexus between the decisions of other managers and the decision-makers in her case, the Court's intent was

_____

[15]   See footnote 11.  As noted, in retrospect, the Court should have overruled the motion as to derogatory remarks by Blessing as well as Reddick.  Again, however, the oversight was immaterial because plaintiff's eventual proffer raised no claim that Blessing made age-derogatory remarks.

to exclude anecdotal testimony that Sprint managers outside of plaintiff's chain of command discriminated against other employees.[16]  The Court did not intend to exclude other evidence that the RIF (Sprint's stated nondiscriminatory reason for plaintiff's termination) was a pretext for age discrimination.

The Court allowed testimony by Bob Browne, plaintiff's former supervisor at Sprint, that the age composition of BDS was heavily skewed toward young people.  Plaintiff also presented documents from Sprint's succession planning file.  See Trial Exs. 3, 4.  Exhibit 4 included a spreadsheet which showed the age of each BDS employee who was employed at the time of the RIF, the age of each BDS employee who remained in BDS after the RIF, the age of each employee who transferred to another department at Sprint, and the age of each BDS employee whose employment was terminated.  See Trial Exh. 4 at 466-471.  In admitting Exhibit 4, the Court stated as follows:

---

[16]     When defendant objected to admission of evidence about RIF procedures, the Court stated as follows:

> I'm afraid that you don't really comprehend what I was saying . . . on the motion in limine.  It was never my intent to preclude plaintiff from putting on evidence about the RIF, how it worked, whether Sprint followed its own RIF procedures, et cetera.  [B]ecause of the factual background of plaintiff's claim, we have to get into what happened to other employees. . . .

> As I understood the motion in limine, you were asking me to prevent, for example, plaintiff from testifying that Sprint treated other people unfairly on the basis of age. * * * You wanted the court to prohibit other employees . . . from coming in and saying, I was RIF'd, it was because of my age and that sort of thing. So that's where I was targeting my ruling.  And I stand by that ruling.  I don't want that kind of evidence to come in.  But I think that's a totally different question from the question whether the RIF, which is your stated nondiscriminatory reason, is a pretext for age discrimination.

Trial Transcript Vo1. 1 (Doc. #144) at 92-94.  The Court understood that plaintiff was entitled to prove that her termination was inconsistent with RIF criteria and that Sprint had falsified or manipulated plaintiff's evaluations under the RIF criteria.  It intended to let plaintiff present such evidence.

> I think the question is whether the RIF was a pretext for age discrimination. And the reason I overruled [defendant's] motion for summary judgment was because there was, I thought, sufficient evidence in the record that Sprint didn't follow its own procedures. I think that makes the whole process, you know, fair game, what was the procedure and was it followed? And if this spreadsheet was used as part of the implementation of the RIF and it has ages on it, then I think that it's fair game for the jury.

Trial Transcript (Doc. #144) at 88. Exhibits 3 and 4 also contained notes on employees whom Sprint terminated as part of plaintiff's RIF. The exhibits demonstrate that Sprint kept information on employee ages along with information on performance and perceived potential. The spreadsheets were not received for a limited purpose and the Court never told the jury that it could consider them only to determine Sprint's compliance with its own procedures. Indeed, both sides used the spreadsheets as substantive evidence that the decision to terminate plaintiff's employment was – or was not – a pretext for age discrimination. Exhibit 4, for example, contained notes showing that as part of the RIF, Sprint terminated older workers who did not report to Reddick. Further, Jo Renda testified that Sprint terminated older employees (including Elster) who were in Blessing's chain of command (but outside Reddick's chain of command). Through Exhibits 3 and 4, plaintiff was able to present evidence that the RIF was a pretext for age discrimination and had a disparate impact on older employees. In response, Sprint used Exhibits 3 and 4 to cite examples of older employees who were retained, even though Reddick did not supervise them.[17]

Before plaintiff rested her case, she proffered testimony of five former employees who

----

[17]    The Court recognizes that statistical evidence is not required to prove discrimination in a case such as this. Beaird v. Seagate Tech.,145 F.3d 1159, 1168 (10th Cir. 1998). Here, however, statistical evidence was available and no one claimed that it demonstrated a company-wide pattern of discrimination. Given the fact that Sprint's company-wide RIF involved about 1,600 employees, however, Exhibits 3 and 4 were significantly more probative on the issue of pretext than the proposed anecdotal testimony of five disgruntled former employees who eventually became the subject of plaintiff's written proffer.

-13-

claimed that Sprint had discriminated against them either because of age or because of age, disability and sex. See Plaintiff's Offer Of Proof Regarding Similarly Situated Employees Terminated As Part Of A Reduction In Force ("Plaintiff's Offer") (Doc. #119) filed January 11, 2005. The employees and the supervisors they implicated were Bonnie Hoopes (and her former supervisor Sharon Vorhies); Yvonne Wood (and her former supervisor Dan Kennedy); Sharon Miller (and a manager Ted Stock); John Borel (and his supervisor Janet Mathus); and John Hoopes (and his supervisor Terri Reynolds). None of the five employees worked in BDS, and none were in the plaintiff's chain of command. All of the five employees had been discussed in the summary judgment process and plaintiff's proffer was essentially a cut-and-paste from the fact section of her brief in opposition to Sprint's motion for summary judgment. See Plaintiff Ellen Mendelsohn's Response Opposing Defendant's Motion For Summary Judgment (Doc. #70) filed August 24, 2004. at 34-39; 41-46; 94-97. Both the proffer and the summary judgment brief harkened back to deposition testimony from the five employees which was part of the summary judgment record, and plaintiff incorporated that deposition testimony into her trial proffer. Accordingly, while it is important to examine what was within the four corners of plaintiff's proffer, the proffer invoked the deposition testimony on which it relied, and the Court considered the deposition testimony as well. At the time of plaintiff's proffer, the record with regard to the five employees was as follows:

     a.     <u>Bonnie Hoopes</u>

In 1991, at age 36, Bonnie Hoopes was laid off in a RIF at Sprint. Sprint rehired her in 1997, at age 42. Sprint terminated her husband (John Hoopes, age 53) in a RIF in 2002 and her daughter (Joanna Higgins, age 29) in a RIF in 2004. On November 22, 2002, Sprint terminated Bonnie Hoopes at age 47 and reassigned her duties to three employees in their 30s and 40s. Bonnie Hoopes was in

PCS, which terminated almost 500 employees in the RIF.

In 2002, Hoopes heard comments about "there being a lot of young people in our group" and "that I was the oldest" and "I had the most seniority." See Plaintiff's Offer Of Proof Regarding Similarly Situated Employees Terminated As Part Of A Reduction In Force ("Plaintiff's Offer") (Doc. #119) filed January 11, 2005 at 2. Hoopes could not identify the speakers and did not claim that they were supervisors or managers at Sprint.

Plaintiff did not identify the PCS group in which Bonnie Hoopes worked. At the time of her termination, however, Bonnie Hoopes was supervised by Chrystal Cone, who reported to Allen Winters, who reported to Tony Castanon. See Defendant's Memorandum In Opposition To Plaintiff's Offer Of Proof Regarding Similarly Situated Employees Terminated As Part Of A Reduction In Force (Doc. #121) filed January 12, 2005 at 2. On November 22, 2002, Cone informed Bonnie Hoopes that her job was eliminated. Bonnie Hoopes was very upset and asked "if this was because I was on disability." Bonnie Hoopes did not ask whether the separation had anything to do with her age.

Bonnie Hoopes had previously worked in Sprint's long distance division, which was balanced between employees over 40 and under 40. In her opinion, however, "if you were over 40, you were an anomaly" in PCS.

Bonnie Hoopes never observed any behavior which she thought was discriminatory because of an employee's age, and she never complained of age discrimination while she was working at Sprint. After the RIF, however, she saw "a lot" of people over 40 at Sprint's outplacement agency, Right Management.

Bonnie Hoopes later opted in to Williams v. Sprint/United Management Co., Case No. 03-

2200-JWL, 2007 WL 2694029, 1 (D. Kan. Sept. 11, 2007), a collective action certified under the ADEA. Plaintiff's trial counsel in this case, Dennis Egan, represented Bonnie Hoopes and the other plaintiffs in <u>Williams</u>. In her deposition, Hoopes claimed that Sprint had discriminated against her on account of age and because she had taken disability.

Vorhies, the former supervisor of Bonnie Hoopes, once told her that she expected her to be "more energetic" and adhere to "Jack Welch's 4Es"[18] and that Bonnie Hoopes was "too old for the job." Vorhies also sent Hoopes and others an e-mail which summarized the Jack Welch rule and indicated a preference for employees "blessed with lots of runway ahead of them." <u>See</u> Vorhies email, attached as Ex. A to <u>Plaintiff's Offer</u> (Doc. #119).

Plaintiff did not contend that Vorhies had anything to do with her RIF or – for that matter – with the RIF of Bonnie Hoopes. The record contained no evidence that Vorhies had anything to do with any decisions by Blessing, Reddick, Fee or anyone else in plaintiff's chain of command.

b.    Yvonne Wood

Sprint hired Wood in 1996, at age 44. On January 15, 2003, in a RIF soon after plaintiff's termination, Sprint terminated Wood's position in PCS, at age 52. Wood believes that in terminating her employment, Sprint discriminated on the basis of disability, sex and age. She believes that Sprint discriminated against other employees on the basis of race. Wood filed suit against Sprint, alleging discrimination on the basis of sex, age and disability. <u>See</u> <u>Wood. v. Sprint/United Mgmt.</u>, Case No. 03-2384 (D. Kan. July 29, 2003) (consolidated for discovery with <u>Williams</u>). Plaintiff's trial counsel in this case, Dennis Egan, represented Wood in her lawsuit.

Wood bases her claim of discrimination on a RIF spreadsheet which an otherwise

---

[18]    She was referring to Jack Welch's "Four Es of GE leadership," which include high energy levels, ability to energize others, the edge to make tough decisions and the ability to execute.

unidentified Sprint employee named Dean Hart created in March of 2002.  Wood received the spreadsheet around January 6, 2003, when supervisor Dan Kennedy accidentally sent it to her instead of to Tom Woodard, a Sprint supervisor.  The spreadsheet apparently had blank spaces for "age, race, and sex," but the actual demographic information was not populated in the spreadsheet which Kennedy sent to Woods.[19]  Based on the unpopulated fields in the spreadsheet, however, Wood believes that Kennedy considered those factors in termination decisions.

The record did not indicate the PCS group in which Wood worked or who made the decision to terminate her employment.  Around 2001, Sharon Miller (who also was part of plaintiff's proffer) told Wood that Stock, a Sprint manager, had described Miller's work group as "a bunch of old, sick people."  The comment related to the fact that Wood was taking time off to go to physical therapy.  Wood never heard of other inappropriate comments regarding employee ages at Sprint.

Wood believed that Sprint used its intern program to effectuate age discrimination, but she did not claim that the intern program had any bearing on her own layoff.  Wood apparently reported to Roberta King, who reported to Stock, who reported to Mike Miller, who reported to Jerry Batt.  Plaintiff did not contend that King, Stock, Miller, Batt or Hart had anything to do with her own termination, or that they had anything to do with decisions by Blessing, Reddick, Fee or anyone else in plaintiff's chain of command.

---

[19]     The spreadsheet which Wood received did not contain information on employee age, race or sex, but she sent a copy to her home computer, took a class in Excel, learned some new commands and found that "at the bottom of the spreadsheet was that thing that said adverse impact information."  The fields for age, sex and race were not populated in the "adverse impact" field which Wood discovered at home.  Wood believes that the spreadsheet was populated by a database on age, sex and race which she could not access.  The record does not establish any foundation for that opinion.  Similarly, the record contains no evidence that Kennedy or Woodard had access to any such protected database.  Nothing in the record suggests that the spreadsheet which Wood saw was the spreadsheet which plaintiff offered at trial as part of Exhibit 4.  Kennedy and Woodard did not work in BDS, however, and information about BDS employees was the subject of Exhibit 4.

  c.  <u>Sharon Miller</u>

Sprint hired Miller in 1990, at age 40.  Sprint had a layoff in October of 1993, and Miller volunteered to leave full-time employment to home-school her youngest son and do part-time work. Miller returned to Sprint on October 1, 2002, at age 52.  Seven weeks later, on November 21, 2002, Sprint terminated her employment in a RIF.  Miller worked in PCS and reported to Sprint Vice President Cloene Davis.  Prior to her re-employment in 2002, Miller worked with Stock as an outside consultant.  Stock frequently made age-derogatory comments and told Miller that he had "too many older people" and "ailing old sick people in his department" and that he was waiting for layoffs so that he could "clean up his department."  <u>See</u> <u>Plaintiff's Offer</u> (Doc. #119) at 4.

  Plaintiff's proffer did not state the PCS group in which Miller worked.  Miller did not work with Blessing, Reddick or Fee or anyone in BDS.  In November of 2002, Miller understood that PCS was going through a reorganization which included downsizing.  When she learned that her position was being eliminated, she was not surprised; she understood what was taking place and her reaction was "thank you very much and I'll be on my way."  She later filed suit against Sprint alleging age discrimination.  <u>See</u> <u>Miller v. Sprint/United Mgmt.</u>, Case No. 04-2003 (D. Kan. January 5, 2004) (consolidated with <u>Williams</u> for discovery).  Plaintiff's trial counsel in this case, Dennis Egan, represented Miller.  Miller believes that she "was perceived as an old timer or too expensive because of my age and experience and qualifications."

  d.  <u>John Borel</u>

Sprint hired Borel in 2000 at age 54.  In a RIF on February 26, 2003, Sprint terminated his employment at age 56.  Borel claims that his termination was based on age.  Shortly before the termination, Jay Cole, a Sprint manager, told him that "he wanted me on his team."  He later told Borel that he was not allowed to put in for the position because he had been "banned" and had an

adverse performance rating in his file.  Cole also told Borel that he had over 100 people put in for the position and that he had many, many qualified applicants.  Although the Supreme Court opinion suggests otherwise, the proffer did not suggest that Sprint banned Borel because of his age.  See Sprint/United Mgmt. v. Mendelsohn, 128 S.Ct. 1140, 1143 (2008).

Borel's supervisor, Janet Mathus, told Borel that her supervisor, Mohammad Hussain, had instructed her to give Borel an adverse performance rating.  After Borel was laid off, a younger employee assumed some of his duties.

Borel filed an age discrimination lawsuit against Sprint.  See Borel v. Sprint/United Mgmt., Case No. 04-2008 (D. Kan. January 9, 2004) (consolidated for discovery with Williams).  Plaintiff's trial counsel in this case, Dennis Egan, represented Borel.  Borel believes that Sprint discriminated on account of his age because "I was told . . . it was because my job was eliminated, but why would they give me an adverse rating if my job was eliminated if I'd done a good job.  I think there had to be something else."

Borel heard that Carol Kipps, who worked in another employee group which reported to Hussain and who had an adverse performance evaluation, was harassed because of age.  More specifically, he understood that Kipps was on medical leave for back problems and "they laid her off when she got back."  Borel had no direct knowledge of her situation.

Plaintiff did not allege that Cole, Mathus or Hussain were involved in any decision concerning her or that they had any influence on decisions by Blessing, Reddick, Fee or anyone else in her chain of command.

e.    John Hoopes

On February 8, 2002 (nine months before plaintiff's RIF), Sprint terminated John Hoopes (the husband of Bonnie Hoopes) at age 53.  A younger manager assumed his duties.

An unnamed Sprint employee once asked Hoopes why he was hiring someone 48 years old for a particular job.  Hoopes claims that Sprint terminated his employment because of his age and he opted in to an age discrimination case against Sprint, Williams v. Sprint/United Mgmt., Case. No. 03-2200.  Plaintiff's trial counsel in this case, Dennis Egan, represented John Hoopes.

John Hoopes had information about "widespread age discrimination at Sprint."  It consisted of (1) his experience at Right Management (which operated an outplacement facility for former Sprint employees) where he only saw an "occasional" person who was under 40; and (2) the fact that he was over 50 when he was laid off within three years of early retirement age.  Hoopes admitted that his knowledge of age discrimination at Sprint is "just speculation," but he felt that it was in his best interest to opt in to the age discrimination suit.  Hoopes "wouldn't know on [his] case alone," but he believed that "someone outside the company should . . . take a look at the process to see if it was discriminatory."  John Hoopes' supervisor, Reynolds, never supervised plaintiff.  Reynolds had no nexus to Blessing, Reddick or Fee, and plaintiff does not allege that Reynolds had anything to do with her own layoff.

In summary, none of plaintiff's five witnesses worked in BDS or reported to Blessing, Reddick or Fee.  Bonnie Hoopes, Wood and Miller were the only witnesses who worked in PCS, which eliminated nearly 500 positions in the RIF, and plaintiff's proffer did not identify the PCS departments in which they worked.  Plaintiff did not logically or reasonably tie evidence of how Sprint treated any of the five witnesses to the decision to terminate her own employment.

Based on the proffer, viewed in light of the summary judgment record which plaintiff incorporated by reference, the Court believed that the proffered testimony of how Sprint treated the five employees outside plaintiff's chain of command was not admissible.  It had only the slightest

relevance (if any) to plaintiff's theory that Blessing and Reddick terminated her employment in MFS and BDS on account of her age, or to whether Sprint's stated reason for plaintiff's termination – the RIF – was a pretext for discrimination.  <u>See</u> Rule 401, Fed. R. Evid.  Further, any slight relevance was grossly outweighed by the risk of unfair prejudice, confusion of the issues, misleading the jury and considerations of waste of time.  <u>See</u> Rule 403, Fed. R. Evid.

As for the proffered evidence of age-derogatory remarks, plaintiff did not show a connection between any of the statements and the decision to terminate plaintiff's employment.  <u>See</u> <u>Stover v. Martinez</u>, 382 F.3d 1064, 1077-78 (10th Cir. 2004) (citing <u>Rea v. Martin Marietta Corp.</u>, 29 F.3d 1450, 1457 (10th Cir. 1994)) (to show animus, plaintiff must demonstrate nexus between allegedly discriminatory statements and defendant's decision to terminate plaintiff's employment).  Therefore, the evidence of discriminatory remarks would not have assisted in the development of a reasonable inference of discrimination within the context of this case, and it was not relevant.  <u>See</u> Rules 401, 402, Fed. R. Evid.  Furthermore, even if the proffered testimony had some slight probative value on the issue of pretext, its limited value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, and by considerations of undue delay and waste of time under Rule 403, Fed. R. Evid.

C.    <u>Post Trial Rulings</u>

The jury returned a verdict for Sprint, and the Court entered judgment in accordance with the verdict.  Plaintiff filed a post-trial motion, seeking a new trial on the sole ground that the Court had erroneously excluded evidence that Sprint terminated other "satisfactorily-performing, long-service older employees" in PCS in the same or similar time frame as plaintiff.  <u>Plaintiff's Motion For New Trial</u> (Doc. #131) filed January 28, 2005, at 1-2.  Plaintiff did not claim that the Court had erred in

-21-

excluding evidence from employees who worked outside of PCS, in the long distance, local telephone or corporate divisions.[20]  Rather, plaintiff asserted that Bonnie Hoopes, Wood and Miller were terminated in a RIF in "the same or similar time frame" as plaintiff and that John Hoopes was terminated in some other RIF.  See id.; Suggestions In Support Of Plaintiff's Motion For New Trial ("Plaintiff's Suggestions") (Doc. #132) filed January 28, 2005, at 2-3.  Furthermore, although her proffer at trial contained no such evidence, plaintiff asserted that all four employees had records of solid or high performance.[21]  See Plaintiff's Suggestions (Doc. #132) at 2-3.  The Court overruled the motion for a new trial, stating that "none of the proffered evidence [made] it more likely that the decision makers in this case discriminated against plaintiff."  See Order (Doc. #135) filed February 28, 2008.  Plaintiff appealed.

The Tenth Circuit reversed, finding that this Court had improperly applied a per se rule in excluding "me too" testimony of former employees.  See Mendelsohn v. Sprint/United Mgmt., 466 F.3d 1223, 1228-30 (2006).  The Tenth Circuit further ruled that evidence that "Sprint terminated five other employees over the age of forty as part of the same RIF" was per se admissible under Federal Rules of Evidence 401 and 403, and remanded for a new trial.  The United States Supreme

---

[20]      Perhaps because he did not work in PCS, plaintiff's post-trial motion did not complain about the exclusion of evidence regarding Borel.

[21]      The evidence which plaintiff cited in her motion for a new trial took great liberty with the evidence cited in her trial proffer.  In the Suggestions In Support Of Plaintiff's Motion For New Trial (Doc. #132), for example, counsel argued that "[t]he jury heard that Ellen Mendelsohn had years of positive ratings, only to be victimized by a 'secret' forced ranking that took place in executive succession planning exercises before the RIF."  Id. at 7.  Plaintiff said that the jury "would have heard a very similar story from Bonnie Hoopes," but her proffer did not contain a single reference to performance evaluations for Bonnie Hoopes, to any "inexplicabl[e] plummet[]" in her ratings or to any awards which she had received.  Id. at 7-8 & n.2.  Similarly, plaintiff complained that the Court excluded evidence that "Bonnie Hoopes, John Hoopes, etc." suddenly received poor performance reviews after "years of superior ratings."  See id. at 8 & n.2.  Nothing in plaintiff's proffer hinted at such evidence.

-22-

Court granted certiorari on the question whether the Federal Rules of Evidence required admission

of the testimony.  See Sprint/United Mgmt. v. Mendelsohn,128 S.Ct. 1140, 1143 (2008).  It then

ruled that the Tenth Circuit had erred in concluding that this Court had applied an improper per se

exclusionary rule and that the Tenth Circuit had improperly engaged in its own analysis of the

relevant factors under Rules 401 and 403.  The Supreme Court vacated and remanded with

instructions for this Court to clarify the basis for the evidentiary ruling, as follows:

> The question whether evidence of discrimination by other supervisors is relevant in
> an individual ADEA case is fact based and depends on many factors, including how
> closely related the evidence is to the plaintiff's circumstances and theory of the case.
> Applying Rule 403 to determine if evidence is prejudicial also requires a
> fact-intensive, context-specific inquiry.  Because Rules 401 and 403 do not make
> such evidence per se admissible or per se inadmissible, and because the inquiry
> required by those Rules is within the province of the District Court in the first
> instance, we vacate the judgment of the Court of Appeals and remand the case with
> instructions to have the District Court clarify the basis for its evidentiary ruling under
> the applicable Rules.

Mendelsohn, 128 S.Ct. at 1147.

## **Analysis**

As a preliminary matter, the Court addresses Plaintiff's Combined (1) Motion To Hold

Pretrial Evidentiary Hearing; And (2) Motion To Enforce Conditional Settlement Agreement (Doc.

#174) filed May 28, 2008.  In that motion, plaintiff "respectfully" suggests that a without a de novo

pretrial evidentiary hearing, this is a "pre-ordained 'sham' proceeding that will again rubberstamp

the 100% exclusion of other-supervisor evidence."  Id. at 1-3.  Apparently, the point of the hearing

would be threefold: (1) for plaintiff to make a new proffer to suit the changed theory of her case, (2)

for the Court to "**for the first time**, fully **inquire** into the admissibility of plaintiff's proffered

evidence, under Rules 401 through 403," and (3) for the Court to order a new trial.  See Plaintiff's

Hearing Memorandum (Doc. #171) at 2 (emphasis in original).

Actually, however, the Court has already "fully inquired" into the admissibility of the proffered evidence. An evidentiary hearing is not necessary to address that issue "for the first time." Also, the proffer record is not in dispute and neither the Tenth Circuit nor the Supreme Court has directed the Court to elicit a new proffer. Nothing in the Supreme Court decision suggests that an evidentiary hearing is required, and one certainly is not necessary for this Court to clarify its prior evidentiary ruling. See Mendelsohn, 128 S.Ct. at 1147. The Court therefore overrules plaintiff's motion for a pretrial hearing.[22]

As noted, plaintiff proffered anecdotal evidence of discrimination and age-derogatory remarks by supervisors outside her chain of command and unrelated to her. Whether the proffered testimony was admissible depended on many factors, including how closely related the evidence was to the plaintiff's circumstances and theory of the case. See id. Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Where the relevance of one piece of evidence turns on the admission of another, Rule 104(b), Fed. R. Evid. requires the proponent to provide the foundation for admission. Thus, an offer of proof must not only include the evidence sought to be admitted but also any foundational evidence necessary to make the evidence admissible. See 21 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure: Evidence 2d § 5040 (2007). Finally,

---

[22]     All of the issues discussed in this order are *purely* academic unless this Court (or some other court) orders a new trial. The parties have a conditional settlement agreement which provides that plaintiff will receive nothing unless some court orders a new trial. Reply Brief (Revised) of Sprint/United Management Company On Remand From The Supreme Court Of The United States (Doc. #175) filed May 28, 2008 at 4. As set forth below, this Court finds no basis for a new trial and therefore denies plaintiff's motion to enforce the parties' conditional settlement agreement.

relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. Rule 403.

I.    Evidence Of Discrimination By Other Supervisors

        In the pretrial order, plaintiff alleged that in deciding to terminate her employment in the RIF, BDS supervisors overlooked her relative qualifications and made transfers through which Sprint treated younger employees more favorably than plaintiff.  Plaintiff now asserts that "me too" evidence was relevant to pretext because Sprint terminated four of the five witnesses (all but John Hoopes) in a RIF in PCS within three months of her termination.[23]  Further, plaintiff now claims that four of the witnesses (all but Miller) testified that younger employees assumed all or some of their duties after the RIF.[24]

        To the extent that the proffer identified discrete acts of discrimination, plaintiff did not tie them to Sprint's decision to terminate her employment.  Unlike the spreadsheets which the Court received in evidence, the excluded testimony consisted of anecdotal, subjective claims of age discrimination or (to further confuse matters) anecdotal subjective claims of discrimination on the basis of age, sex and disability.  Plaintiff presented no evidence that any supervisor who allegedly discriminated against the five witnesses had any connection to plaintiff's chain of command or that

_____

[23]    The proffer claimed that Bonnie Hoopes, Wood and Miller worked in PCS.  It did not claim that Borel or John Hoopes worked in PCS.  In her motion for a new trial, plaintiff did not complain that the Court improperly excluded evidence by or about Borel.

[24]    The proffer claimed that younger employees assumed the duties of Borel and John Hoopes.  The proffer also claimed that three individuals – two in their 30's and one in his 40's – assumed the duties of Bonnie Hoopes (age 47).  As to Wood, the proffer claimed that Sprint "brought in an intern" of unspecified age who "was going to be doing [her] job."  See Proffer (Doc. #119) at 3.

Sprint had a company-wide practice of age discrimination which infected the entire culture of Sprint or of which Blessing, Reddick and Fee were aware. None of the five employees worked in BDS. None of them reported to anyone in plaintiff's chain of command. About 1,600 employees were terminated in plaintiff's RIF. Sprint eliminated nearly 500 PCS positions in the RIF. Plaintiff's proffer only suggested that three of the five witnesses were terminated in the same RIF as plaintiff. Three witnesses claimed to be victims of age, disability and/or sex discrimination (Bonnie Hoopes, Wood and Miller). Plaintiff's proffer alleged discrimination in undisclosed departments in a corporation which employed 65,000 to 70,000 employees. It had essentially no relevance to the question whether Blessing and Reddick engaged in discrimination. See Heno v. Sprint/United Mgmt., 208 F.3d 847, 856 (10th Cir. 2000) (plaintiff must tie prior incidents to actions disputed in case at hand; one way to do so is to show that employees had same supervisor). In summary, plaintiff did not show a nexus between the allegedly discriminatory acts and the decision to terminate her employment.

Even assuming that the proffered testimony had some probative value, the limited probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, and by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Fed. R. Evid. 403. Testimony that Vorhies, Kennedy, Stock, Mathus or Reynolds or other unnamed supervisors discriminated against the five witnesses would have resulted in mini-trials that would have created confusion and waste of time – and would have opened the door to contrary evidence from hundreds or thousands or tens of thousands of employees who did not claim to be victims of age discrimination.

Finally, if the Court erred in excluding the proffered testimony, any such error was harmless.

-26-

See Sims v. Great Am. Life Ins. Co., 469 F.3d 870, 886 (10th Cir. 2006) (applying harmless error standard to district court's erroneous exclusion of evidence).   An error is harmless unless it prejudicially affected a substantial right of a party or the Court can reasonably conclude that the exclusion of the evidence led the jury to reach a contrary result.   Praseuth v. Rubbermaid, Inc., 406 F.3d 1245, 1253 (10th Cir. 2005).   None of the proffered evidence made it more likely that the decision makers in this case discriminated against plaintiff.

As noted, plaintiff did not claim or prove a pattern and practice of age discrimination.   The pretrial order did not allege, and the evidence did not suggest, that the RIF *in general* constituted discrimination on the basis of age.   Further, neither the pretrial order nor the proffered testimony suggested that the RIF itself was a pretext for age discrimination.   The Court has respectfully considered the contrary views of the Tenth Circuit Court of Appeals, but continues to believe that the proffered evidence of discrimination by other supervisors was not admissible to establish that Sprint's termination of plaintiff in the RIF was a pretext for age discrimination, and that it properly excluded such evidence under Rules 401 and 403.

## II.   Age-Derogatory Remarks

To show discriminatory animus based on discriminatory statements, plaintiff generally must show (1) that a decision-maker made the statements and (2) that the statements had a nexus to the adverse employment action.   See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998).   Generally, plaintiff cannot rely on statements by non-decision-makers.   See Cuenca v. Univ. of Kan., 101 Fed. Appx. 782, 788 (10th Cir. 2004).   An exception exists, however, if the record contains evidence from which a jury may reasonably infer that a decision-maker adopted or relied upon the discriminatory statement in making an adverse employment decision.   See id. (citing

Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1097 (6th Cir. 1996)).

In response to defendant's motion in limine, plaintiff argued that she should be allowed to introduce testimony by former Sprint employees who alleged that they heard Sprint supervisors or managers make age-derogatory remarks. At that time, plaintiff identified no specific evidence of any such remarks. In her proffer at trial, however, plaintiff cited age-derogatory comments by (1) Bonnie Hoopes's former supervisor, Sharon Vorhies[25] and (2) manager Ted Stock.[26] In her post-trial motion, plaintiff reiterated that proffer.

Plaintiff did not contend that Vorhies or Stock had anything to do with her own layoff, and she did not otherwise tie any alleged animus by Vorhies or Stock to Reddick's decision to terminate her employment. Plaintiff did not suggest that Blessing, Reddick or Fee made any discriminatory remarks. Vorhies and Stock did not work in the same group as plaintiff, were not in the same chain of command as plaintiff and did not participate in the decision to terminate plaintiff's employment. Plaintiff demonstrated no connection between any of the age-derogatory statements and the decision to terminate her employment. The evidence would not have assisted in the development of a reasonable inference of discrimination within the context of this case. The Court thus finds that the proffered evidence of discriminatory remarks was not relevant or had only the tiniest degree of relevance.

Even if the proffered testimony had some probative value on the issue of pretext, the limited probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the

---

[25] Vorhies told Hoopes that she was "too old for the job" and in an e-mail stated that she preferred employees "blessed with lots of runway ahead of them." See Plaintiff's Offer (Doc. #119) at 2.

[26] Miller told Wood that Stock described Wood's work group as "a bunch of old, sick people." Miller frequently heard Stock made ageist comments.

-28-

issues, misleading the jury, and by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." See Fed. R. Evid. 403.  In particular, the issue whether

Vorhies and Stock made age-derogatory statements would have resulted in mini-trials and would

have created confusion and waste of time, again opening the door to testimony that legions of Sprint

managers inside and outside of plaintiff's chain of command did not make age-derogatory comments.

Finally, if the Court erred in excluding the proffered testimony, any such error was harmless.

As the Court noted in ruling on plaintiff's motion for a new trial,

> None of the proffered evidence makes it more likely that the decision makers in this
> case discriminated against plaintiff.  Further, plaintiff inexplicably asserts that the
> jury commented that this was "a close case." . . .  In fact, the jurors stated that while
> counsel had presented plaintiff's evidence in the best possible light, this was *not* a
> close case because plaintiff presented no persuasive evidence of age discrimination.

See Order (Doc. #135) filed February 28, 2005.  The Court reiterates that had the jury heard the

proffered evidence, it would not have changed the outcome.

**IT IS THEREFORE ORDERED** that Plaintiff's Combined (1) Motion To Hold Pretrial

Evidentiary Hearing; And (2) Motion To Enforce Conditional Settlement Agreement (Doc. #174)

filed May 28, 2008 be and hereby is **OVERRULED**.

The Clerk is directed to re-enter judgment for defendant.

Dated this 4th day of November, 2008 at Kansas City, Kansas.

Kathryn H. Vratil
s/Kathryn H. Vratil
United States District Judge

-29-